**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DEBRA LINDA WILLIAMS** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.  13-5566** |
| | : | |
| **CAROLYN W. COLVIN,** | : | |
| **Acting Commissioner of** | : | |
| **Social Security** | : | |

<u>**MEMORANDUM OPINION**</u>

**Savage, J.**                                                                     **January 14, 2015**

In this social security case, Debra Linda Williams requests review of the Administrative Law Judge's ("ALJ") decision to deny her Social Security disability insurance ("SSDI") benefits. She asserts three grounds for reversal of the decision: (1) the ALJ failed to properly weigh the medical evidence by giving "little weight" to the opinions of her treating mental health providers and giving "significant weight" to the opinion of the non-examining state agency psychologist; (2) the ALJ failed to properly weigh her credibility; and (3) the hypotheticals posed to the vocational expert ("VE") on which the ALJ relied failed to include all her limitations.

After a thorough review of the record, we conclude that the ALJ's findings are supported by substantial evidence.  The ALJ did not err when she assigned more weight to the non-examining doctor's opinion than to the treating providers' opinions because the opinion of the non-examining psychologist was consistent with the whole record, while the treating doctors' opinions were not.  In evaluating Williams's credibility, the ALJ did not err in finding Williams's testimony about the severity of her symptoms and limitations not fully credible.  She properly considered Williams's statements regarding her "symptoms,

limitations, limited activities, and lack of significant response to treatment" and compared it to the record as a whole.  Finally, because the residual functional capacity ("RFC") finding was supported by substantial evidence, and the ALJ was not required to include any of her step three conclusions in the RFC finding, it was not error for the ALJ to rely on the VE's testimony regarding the hypothetical she accepted.  Therefore, we shall deny the plaintiff's request and enter judgment in favor of the Commissioner.

## Background and Procedural History

On March 29, 2011, Williams, who was then forty-four, applied for SSDI benefits, alleging disability due to post-traumatic stress disorder, affective disorder, joint pain, carpal tunnel syndrome, left knee impairment, back pain and asthma. R. at 22, 40, 147.  Her claim was denied initially on June 13, 2011, and she timely requested a hearing before an ALJ on June 22, 2011.  R. at 86-92.

Williams, who has a college degree, was employed by the U.S. Post Office as a commercial or industrial cleaner and a trash collector for the fifteen years prior to her alleged disability onset date of December 15, 2010.[1]  R. at 42-43, 69-70.  Prior to that time, she served in the United States Navy for four years, including on a ship during the first Gulf War in 1991.

After a hearing held on June 8, 2012, at which Williams was represented by counsel, the ALJ determined that Williams had several severe impairments, including asthma/allergies, disorders of the back, carpal tunnel syndrome, knee disorders, polyarthralgias, affective disorder and post-traumatic stress disorder.  R. at 20, 22.  She

---

[1] At the hearing before the ALJ, Williams amended her disability onset date to March 29, 2011.  R. at 20, 39.

2

concluded that these impairments did not preclude Williams from performing light work, limited to unskilled work with routine and repetitive tasks performed in a low-stress environment with no public interaction and only occasional contact with co-workers and supervisors.  R. at 25.  Relying upon a VE's opinion, she then determined that there were jobs available in the national economy for persons with Williams's mental limitations and vocational characteristics.  R. at 31.  Accordingly, on July 27, 2012, the ALJ concluded that Williams was not "disabled."  R. at 31.

On July 25, 2013, the Appeals Council denied Williams's request for review, making the ALJ's decision final.  R. at 1-4.  Williams then filed this action under 42 U.S.C. § 405(g) seeking judicial review of the Commissioner's decision.

### The ALJ's Findings

The ALJ made the following findings in her July 27, 2012 decision:

> 1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.
>
> 2.   The claimant has not engaged in substantial gainful activity since March 29, 2011, the alleged onset date (20 CFR 404.1571 *et seq.*).
>
> 3.  The claimant has the following severe impairments: asthma/allergies; disorders of the back; carpal tunnel syndrome; history of knee disorders; polyarthralgias; affective disorder; and post-traumatic stress disorder (20 CFR 404.1520(c)).
>
> 4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> 5.   After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except is limited

to unskilled work with routine and repetitive tasks performed in a low stress environment (defined as no frequent independent decision making required and no frequent changes in the work setting) with no public interaction and only occasional interaction with co-workers and supervisors.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.   The claimant was born on September 9, 1966 and was 44 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.   The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.   Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from March 29, 2011, through the date of this decision (20 CFR 404.1520(g)).

R. at 22-31.

## Standard of Review

On judicial review, the court determines whether the Commissioner's decision is supported by substantial evidence.  42 U.S.C. §§ 405(g); 1383(c)(3); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008) (citation omitted).  Substantial evidence is "'more than a mere scintilla;' it means 'such relevant evidence as a reasonable mind might accept as adequate.'"  *Thomas v. Comm'r of Soc. Sec. Admin.*, 625 F.3d 798, 800 (3d Cir. 2010) (quoting *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999)).

A reviewing court has no fact-finding role in evaluating the administrative record and may not weigh the evidence or substitute its own conclusion for that of the ALJ. *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 361 (3d Cir. 2004) (quoting *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)). It is bound by an ALJ's findings if they are supported by substantial evidence in the record. *Plummer*, 186 F.3d at 427.

To assure meaningful judicial review, the ALJ must explain clearly and fully the basis of her decision. *Barren Creek Coal Co. v. Witmer*, 111 F.3d 352, 356 (3d Cir. 1997) (quoting *Cotter v. Harris*, 642 F.2d 700, 704-05 (3d Cir. 1981)). She must discuss what evidence supports her determination, what evidence she rejected, and her reasons for accepting some evidence while rejecting other evidence. *Cotter*, 642 F.2d at 705. She must explicitly analyze all relevant evidence in the record and cannot disregard evidence without an adequate explanation. *Reefer v. Barnhart*, 326 F.3d 376, 381-82 (3d Cir. 2003); *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001); *see also Coleman v. Chater*, No. Civ. A. 96-2091, 1997 WL 452192, at *3 (D.N.J. July 22, 1997).

### Sequential Evaluation

Disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). In order to demonstrate eligibility for disability benefits, the claimant must show that she has not been involved in gainful activity and has a severe medical impairment that prevents her from performing past work or any other substantial gainful work that exists in the national economy. *Plummer*, 186 F.3d at 427-28; *see* 20 C.F.R. § 404.1520.

To determine whether a claimant is disabled, the ALJ must apply the familiar five-step sequential process prescribed in the Social Security regulations, 20 C.F.R. § 404.1520(a)(4); *Phillips v. Astrue*, 671 F.3d 699, 701 (8th Cir. 2012); *Rutherford v. Barnhart*, 399 F.3d 546, 551 (3d Cir. 2005).  In the first four steps, the claimant must make a *prima facie* showing of disability by demonstrating that she has a severe impairment that prevents her from performing work she has done in the past.  *Hoopai v. Astrue*, 499 F.3d 1071, 1074 (9th Cir. 2007).  At step one, the claimant must demonstrate that she is not engaged in gainful employment.  *Id.*  At step two, the claimant must show that she has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities[.]" 20 C.F.R. § 404.1520(c).  At the third step, the ALJ determines whether the claimant's impairment or impairments are equal to one of the impairments listed in an appendix to the Social Security regulations.  *See* 20 C.F.R. pt. 404, subpt. P, app. 1 (2014) (the "Listings"). The Commissioner has decided that the listed impairments are so severe that they conclusively render a claimant disabled.  20 C.F.R. § 404.1520(d); *Plummer*, 186 F.3d at 428.  Thus, if the claimant meets her burden at step three by showing that she has a listed impairment or impairments, she is *per se* disabled and the inquiry ends.  20 C.F.R. § 404.1520(a)(4)(iii); *Rutherford*, 399 F.3d at 551.

If the claimant's impairment does not equal one of the listed impairments, the inquiry proceeds to step four where the claimant must show that the impairment prevents her from performing her past relevant work.  *Rutherford*, 399 F.3d at 551.  At this step, the ALJ must first determine the claimant's residual functional capacity ("RFC"), which is her ability to do physical and mental work activities on a sustained basis despite limitations from her

impairments.  *Fargnoli*, 247 F.3d at 40; 20 CFR §§ 404.1520(e), 404.1545.

Once the claimant has established that she cannot return to her previous work, the process moves to the fifth step.  *Id.*  There, the Commissioner has the burden to demonstrate that, considering the claimant's RFC, she "can perform a significant number of other jobs in the national economy.'"  *Hoopai*, 499 F.3d at 1074 (quoting *Thomas v. Barnhart*, 278 F.3d 947, 955 (9th Cir. 2007)); *see also Kane v. Heckler*, 776 F.2d 1130, 1132 (3d Cir. 1985) (citing 42 U.S.C. § 423(d)(2)(A) (1982); *Rossi v. Califano*, 602 F.2d 55, 58 (3d Cir. 1979)).  If the Commissioner meets that burden, the ALJ must find that the claimant is not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(v).

In this case, the ALJ found that Williams met her burden at steps one and two when she determined that Williams had not engaged in any substantial gainful activity since March 29, 2011, and has the severe impairments of asthma/allergies, disorders of the back, carpal tunnel syndrome, history of knee disorders, polyarthralgias, affective disorder and post-traumatic stress disorder.  R. at 22.  At step three, the ALJ determined that Williams did not have an impairment that met or equaled one of the impairments identified in Appendix 1 to Subpart P of Part 404 of the regulations that would render her *per se* disabled.  20 C.F.R. Pt. 404, Subpt. P., App. 1 (the "Listings").  Proceeding to steps four and five, the ALJ found that Williams could not perform the requirements of her past relevant work, but had the residual functional capacity to perform light work, provided the work is unskilled with routine and repetitive tasks performed in a low-stress environment with no public interaction and only occasional interaction with co-workers and supervisors.  R. at 25.  Considering the claimant's age, education, work experience and residual functional capacity and relying upon a VE's opinion, she concluded that a significant

number of jobs existed in the national economy that Williams could perform.  R. at 31.

Thus, the ALJ found Williams was not disabled under the Act.  R. at 31.

<u>Williams's Mental Health Treatment</u>

Williams began her mental health treatment on September 3, 2010, at the Philadelphia Veterans Administration Medical Center ("VA"), when psychiatrist Mee Soon Park, M.D. conducted a psychiatric intake evaluation.  Presenting with symptoms of anxiety and depression, Williams reported that she was experiencing nightmares, panic symptoms and intrusive memories related to her military service during the first Gulf War.  She served in the Navy from 1989-1993, and spent ten months on a ship in 1991 as a night guard on suicide watch over fellow comrades.  Although she experienced nightmares ever since returning from her military service eighteen years earlier, their frequency and intensity increased, leading her to seek treatment.

Williams reported experiencing nightmares three to four times a week, typically dreaming that she was guarding the ship at night and facing someone holding an M16 rifle. Because of the nightmares, Williams was sleeping with the televison and lights on, waking up frequently and sleeping only two or three hours a night.  She was experiencing memories of her friends attempting suicide by jumping off the ship, and of one friend who shot herself in the foot.  These memories produced feelings of guilt, anger and fear.  They resulted in panic symptoms of troubled breathing and rapid heartbeat.  She was also hypervigilant in public, avoided dark places, and avoided crowds by leaving large family gatherings early and working the day shift as a custodian at the Post Office because fewer people work that shift.  She saw friends less often and specifically avoided attending military reunions.

During the intake interview, Williams wore a head scarf and sunglasses. Dr. Park described her as tearful, depressed and anxious, and her right leg shook repeatedly. She demonstrated a logical and linear thought process, had grossly intact cognition, and her insight and judgment were fair. Dr. Park diagnosed her with post-traumatic stress disorder ("PTSD"). She assessed Williams a Global Assessment of Functioning ("GAF") Scale[2] score of 55, and prescribed an antidepressant, Celexa (Citalopram Hydrobromide). R. at 329-34.

Shortly after her psychiatric intake evaluation, psychologist Jason Goodson, Ph.D. conducted a thorough PTSD evaluation. In addition to all of the symptoms and conduct noted by Dr. Park, Dr. Goodson wrote that Williams had reduced interest in activities like softball and volunteering, and had missed several days at work due to low motivation and anxiety. But, he also noted that she had strong social supports because she was close with her sister, two girlfriends, parents and a significant other. He opined that her "symptoms of PTSD appeared to very mildly impact her occupational functioning . . . . [because] overall, she is performing well at work and [is having] no disciplinary problems and reports completing her job related tasks and activities effectively." R. at 304. He

---

[2] GAF scores are used by mental health clinicians and doctors to rate an individual's social, occupational and psychological functioning on a scale ranging from 1 to 100. *Lozado v. Barnhart*, 331 F. Supp. 2d 325, 330 n.2 (E.D. Pa. 2004) (citing *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 2000) at 32). A GAF score ranging from 51-60 indicates "'moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or coworkers).'" *Id.* A score from 61-70 indicates "'some mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational or school functioning (e.g. occasional truancy or theft within the household).'" *Id.*

The most recent edition of the *Diagnostic and Statistical Manual of Mental Disorders* stopped using GAF scores as a diagnostic tool for assessing a patient's functioning because the GAF scale had "a conceptual lack of clarity" and "questionable psychometrics in routine practice." *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013) ("*DSM-5*") at 16.

concluded that Williams's PTSD symptoms were "mildly to moderately impacting her social functioning" because, although she didn't like to leave the house or participate in social gatherings and family functions, she maintained intact family relationships and close, supportive friendships.  R. at 304.  He also concluded that her PTSD symptoms were not impairing her thought processes or ability to communicate, nor were they impacting her activities of daily living. He diagnosed her with PTSD and major depressive disorder - NOS (not otherwise specified).  He gave her a GAF score of 65.  R. at 303-08.

Almost two months later, on November 2, 2010, Williams began treating with a psychologist, Marta MacDougall, Psy.D.  At her initial visit, Williams reported that: (1)  she was experiencing nightly nightmares, causing her insomnia to worsen; (2) she was feeling highly anxious; and (3) she frequently cried and was withdrawn at work because her mind "drifted off" into bad thoughts.  She reported having recently missed twenty to thirty days of work, though not more than a few consecutive days at a time.  On these occasions, she either called out sick because of "not wanting to get out of bed" or left immediately after arrival because she felt overwhelmed.  During the interview, Williams wore dark glasses and a scarf, shook and stroked her leg, [and] appeared depressed, highly anxious, tearful and overwhelmed.  Her thought process, insight and judgment were intact.  Positive factors were that she lived alone in a home she owned and had a supportive family.   Dr. MacDougall confirmed her diagnosis of PTSD.  R. at 320-21.

Williams's next mental health appointment was on November 19, 2010, with Margot O'Donnell, M.D., a board-certified psychiatrist.  Williams reiterated the symptoms she reported to Dr. MacDougall a few weeks earlier.  She requested to stop taking the antidepressant medication because she felt it wasn't working and that talking with providers

and family about her problems was more effective.  When Dr. O'Donnell recommended increasing the dosage, Williams resisted.  Consequently, Dr. O'Donnell instructed her to taper off of the medication. She had a GAF score of 55.  R. at 318-20, 294.

More than two months later, on January 27, 2011, Williams reported to Dr. MacDougall that her boss had recently suggested she take disability retirement due to poor work performance due to back pain and her anxiety and crying at work.  She also told her she was considering attending a military reunion in a few months to get closure on her military experience.  R. at 317-18.

Three weeks later, on February 17, 2011, Williams reported to Dr. MacDougall that the frequency and intensity of her nightmares remained the same, and that she was having difficulty controlling her crying and irritability at work.  She had had an argument with her supervisor because she wanted to sit close to the door in a dark room during a training film.  She said she was highly anxious and stressed about her work situation, was continuing to experience insomnia and almost nightly nightmares.  During the treatment session, her affect was dysphoric and anxious, and she shook and stroked her leg.  Because of these symptoms, Williams expressed a desire to resume taking the antidepressant, which she had not taken in over two months.  R. at 314-15.

Despite telling Dr. MacDougall that she would call her psychiatrist to re-prescribe it, Williams did not see a psychiatrist nor did she take Celexa until four months later.  During that time period, between February and June, 2011, she had a follow-up PTSD evaluation, stopped working, attended three sessions at a Behavioral Sleep Medicine clinic to address her insomnia, saw her psychologist two more times, and was admitted to Friends Hospital for a five-day inpatient psychiatric hospitalization.   Just prior to her

11

hospitalization, she appeared to be relatively stable.  She had not taken any psychotropic medication for several months, was feeling less stress due to her recent retirement from work, and was planning to attend a military reunion of her shipmates in July.  However, she did feel new stress brought on by news of the recent assassination of Bin Laden.  R. at 294-99, 312-13, 310-11, 426-27, 424-25, 446-47.

The hospitalization was prompted by an incident where Williams had gotten out of bed during the night, cut her hair, put on a military uniform, and walked to the highway and saluted cars, with no memory of how or why she had gotten there.  On admission, she reported visual and auditory hallucinations, and presented with an anxious and depressed mood, fair insight and judgment, and a coherent thought process.  Her GAF on admission was 15. Within a day, she no longer had hallucinations. During the hospitalization, she had no psychosis and her sleep was stable.  She rejected psychiatric medication.  At discharge, she was diagnosed with PTSD and depression (NOS), given a GAF score of 60 and no medication was prescribed.  R. at 446-47.

Immediately after being discharged from the hospital, Williams was seen by a walk-in psychiatrist at VA, who noted that she had an appropriate affect, good eye contact, a logical thought process, intact cognition, a neutral mood and fair judgment, memory, concentration and attention.  At Williams's request, the psychiatrist prescribed Celexa. That day, Williams also saw Dr. MacDougall, reporting that she found her time at the hospital "very helpful," including a family meeting where friends and family arranged to check in on and spend time with her.  Dr. MacDougall concluded that the events leading up to her hospitalization had likely been a dissociative episode.  R. at 415-19.

According to the treatment notes following her psychiatric hospitalization, Williams's

mental health gradually improved over the next twelve months.  In July of 2011, Williams told her psychologist that she was "doing better" and experiencing reduced anxiety. Although she was still having nightmares and trouble sleeping, she was in daily contact with a family member, had begun an exercise class, and was planning to start treatment for insomnia at VA, all of which helped improve her mood.  She had resumed taking her antidepressant medication and was still considering going to a military reunion with her shipmates later in the month.

A few weeks later she visited her psychiatrist, Dr. O'Donnell, whom she had not seen in more than eight months.  She reported that her nightmares and insomnia were still problematic, and that she was taking her medication.  She agreed to Dr. O'Donnell's referral to VA's weight management program.  Williams planned to schedule biweekly individual psychotherapy sessions at the local Vet Center.[3]  Additionally, she completed her home sleep study.  R. at 412-414, 402-07.

In September, Williams reported to Dr. MacDougall that she was doing "pretty good," without attending therapy sessions at the local Vet Center.  At her appointment in early October with Dr. O'Donnell, she appeared anxious and guarded, and reported that despite her use of stimuli control, she still had problems sleeping.  She advised that she was busy with her family, housework and paperwork, and was compliant with taking her Celexa.  Dr. O'Donnell prescribed Prazosin to address nighttime hyperarousal symptoms. By the time of her appointment with the psychologist in late October, she reported that she had "been pretty good" and was "doing well," but still was "not sleeping much."  She was

---

[3] Local Vet Centers, located in neighborhoods throughout the country, provide counseling, outreach, and referral services to combat Veterans and their families.  *See* http://www.vetcenter.va.gov/.

hopeful that the new medication, Prazosin, would help her with her insomnia. She was excited about participating in the weight management program, and was scheduled for a therapy appointment at the Vet Center.  Her mood had improved.  She was optimistic about the future.  R. at 399, 477-80, 471-72.

When she saw her psychiatrist one month later in November, Williams reported that although she was still experiencing insomnia and nightmares several times per week, she felt her energy, concentration and mood were "good" on most days.  Additionally, she conceded that she had not been taking her Prazosin regularly.  Because she had been taking Celexa for five months with no meaningful improvement in hyperarousal or hypervigilance symptoms, Dr. O'Donnell recommended that she taper off the Celexa and try a new antidepressant.  Williams declined to try a new antidepressant.  She wanted to see whether she could manage without such medication.  But, she agreed to continue taking the Prazosin on a regular basis.  When she saw her psychologist two weeks later, on December 1, 2011, Williams was "stable."  She reported feeling "very good" with an "improved mood," and that she was eating better and losing weight as a result of her participation in a weight management program.  Though she was "still not sleeping great," she also was still not taking her Prazosin regularly.  Notably, she rejected therapy because she was "doing so well" but expressed an interest in continuing "check-in" treatment sessions every four months to ensure she was "staying on track."  R. at 466-70.

Approximately two months later, on January 26, 2012, Williams told her psychiatrist that she had been experiencing occasional mood swings, depression, crying occasionally and was still experiencing nightmares and insomnia.  She attributed the depressed moods to increased knee and back pain, which was making her feel sad as well as preventing her

14

from exercising as much as she used to, which led to some weight gain. Because the dysphoric mood recurred when she was not taking an antidepressant, Dr. O'Donnell prescribed Effexor, a different antidepressant, which Williams was amenable to trying.  A month and a half later, Williams told Dr. O'Donnell that she wanted to discontinue the Effexor because it gave her headaches and upset her stomach.  The doctor advised her to taper off the medication. At that time, Williams also told her psychologist that she was still experiencing back and knee pain, which was the primary source of her feeling frustrated and depressed, though most of the day she was not depressed.  She denied need for help or therapy to deal with her frustration and sadness from the pain.  She was still having trouble sleeping, and was interested in pursuing cognitive behavioral therapy strategies to help with her insomnia.  Other than the physical pain, "everything else" was "good," and she was spending time with family and friends, engaging in enjoyable activities, listening to music and comedy tapes, and reading poetry.  R. at 462-65, 457-59.

By early April, 2012, Williams was "doing very well."  She reported that her "body [wa]s getting better and [her] mind [wa]s good;" she felt good about losing weight and weaning off psychotropic meds; her mood was "good;" and she was staying very active with family and friends.  She was volunteering at the neighborhood youth recreation center and helping her mother prepare for knee surgery.  She was still tapering off Effexor.  When Dr. O'Donnell offered her a different medication to treat her depression and insomnia that was less likely to cause stomach problems, she declined because she "want[ed] to take a break from pills."  Her psychiatrist also approved her request to stop taking Prazosin because she felt it was having little effect.  She was scheduled to see the psychiatrist three to four months later.  Additionally, Williams told Dr. MacDougall that she was ready to

terminate individual therapy with her and did not feel the need for psychotherapy at the Vet Center.  R. at 453, 455-57.

Two months later, on May 30, 2012, Williams attended her first counseling session at the local Vet Center.[4]  She told the counselor that she was experiencing nightmares four or five times a week, and was having trouble sleeping.

Three weeks later, on June 18, 2012, her hearing before the ALJ took place.  At a counseling session at the Vet Center two days after the hearing, Williams discussed her experiences while on active duty and her avoidance of dark places.  R. at 489-93.

On July 2, 2012, two weeks after her hearing, Williams officially finished treatment with her psychiatrist.  She told Dr. O'Donnell that she had connected with a therapist at the local Vet Center and felt "safe and supported there."  She reported feeling "ok" and that she was spending time with family.  Later that month, on July 27, 2012, the ALJ issued her decision.  Two weeks later, Williams had another counseling session at the Vet Center, where she discussed her problems sleeping as well as bad memories of her active duty. One month later, on September 13, 2012, she saw Dr. MacDougall.  Williams had called her for an appointment a month earlier because at that time she was having a lot of physical pain, which made her feel "a little depressed."  By the time of the appointment, her pain had subsided, and she was feeling "fine" and in a "good" mood.  She was back to doing her regular activities.  She told Dr. MacDougall that she had attended some therapy sessions at the Vet Center, and while she didn't want to work on any long-term therapy goals, she wanted to "check in with someone at the VA every now and then."  Dr.

---

[4] The ALJ did not see records of this visit, nor any subsequent visit, at the local Vet Center because Williams's counsel submitted these records to the Appeals Council in November, 2012, which was after the ALJ issued her decision.

MacDougall referred her to the psychiatrist for periodic check-ins at VA.   The final treatment note in the record is a counseling session at the Vet Center on October 15, 2012, where Williams discussed her insomnia and her experiences while on active duty. R. at 512-13, 492, 508-09, 503-04, 492.

## Discussion[5]

### The ALJ's Evaluation of the Mental Health Opinion Evidence

Williams contends that the ALJ improperly weighed the opinions of her treating mental health providers. She argues that the ALJ erred when she gave "significant weight" to the opinions of a non-examining state agency psychologist while giving "little weight" to the opinions of her treating board-certified psychiatrist Margot O'Donnell, M.D. and treating psychologist Marta MacDougall, Psy.D.

The opinions of a treating physician are entitled to substantial and, in some cases, controlling weight when they are well-supported by the medical evidence and are not inconsistent with the other evidence. *Johnson*, 529 F.3d at 202 (citing *Fargnoli*, 247 F.3d at 43); 20 C.F.R. § 404.1527(c)(2).   The treating physician's opinions should be given "great weight, 'especially when the opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'"   *Brownawell v. Comm'r of Social Security*, 554 F.3d 352, 355 (3d Cir. 2008) (quoting *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)).   Conversely, the opinions of a physician who has never examined the patient are not usually as relevant to the ALJ's decision as those of a physician who had treated or examined her.   *Morales*, 225 F.3d at 320 (citation omitted).

---

[5] Williams does not dispute the physical limitations found by the ALJ.  *See* Pl.'s Br. and Statement of Issues in Supp. of Her Req. for Review ("Pl.'s Br.") at 2 n. 3.

Where the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose to accept the latter so long as she does not ignore the findings that support the treating physician's opinion and there is medical evidence that contradicts the treating physician's opinion. *Brown*, 649 F.3d at 196-97 (quoting *Morales*, 225 F.3d at 317) ("[if] the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but cannot reject evidence for no reason or for the wrong reason")). When she rejects the treating physician's opinion, the ALJ must adequately explain her reasons for doing so. *Sykes v. Apfel*, 228 F.3d 259, 266 (3d Cir. 2000). Otherwise, a reviewing court cannot determine whether the decision is supported by substantial evidence. *Fargnoli*, 247 F.3d at 40-41 (citing *Cotter*, 642 F.2d at 704-05).

An ALJ cannot disregard the medical opinion of a treating physician based solely on his own impressions and his evaluation of the claimant's credibility. *Morales*, 225 F.3d at 318 ("Although an ALJ may consider his own observations of the claimant and this Court cannot second-guess the ALJ's credibility judgments, they alone do not carry the day and override the medical opinion of a treating physician that is supported by the record."). In other words, the ALJ may not substitute his lay opinion for the medical opinion of a treating physician, especially in cases involving mental disabilities. *Id.* at 319.

*Opinions of Psychiatrist, Margot O'Donnell, M.D.*

On July 28, 2011, after having seen Williams on two occasions, eight months apart, Dr. O'Donnell wrote a narrative report summarizing her patient's mental health treatment at VA between September, 2010 and July, 2011. Dr. O'Donnell described Williams as

suffering from "severe PTSD" and major depressive disorder ("MDD").  She stated that her patient's

> symptoms include re-experiencing [traumatic events], hyperarousal and numbing which disable her from working full time in a normal, competitive work setting. Her prognosis is fair.  PTSD . . . can improve with intensive treatment with medications and psychotherapy, but never completely goes away. Her symptoms are very likely to last >12 months [and] . . . to be disabling for >12 months.

R. at 389.

In a contemporaneously completed psychiatric/psychological impairment questionnaire, Dr. O'Donnell noted that Williams's primary symptoms were nightmares, insomnia, flashbacks with dissociation, low motivation, irritability and mood swings.  Her clinical findings supporting the diagnoses of PTSD and MDD were: sleep, mood and appetite disturbance with weight change; recurrent panic attacks; difficulty thinking/concentrating; time or place disorientation; social withdrawal or isolation; intrusive recollections of a traumatic experience; and generalized persistent anxiety.  Dr. O'Donnell concluded that Williams was "markedly limited" in her ability to: understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; sustain ordinary routine without supervision; work in coordination with or proximity to others without being distracted by them; complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and accept instructions and respond appropriately to criticism from supervisors.  She opined that Williams was incapable of tolerating even low stress work and would miss work more than three times per month due to her impairments or treatment.  She assessed a GAF score of 55.  R. at

380-87.

On June 6, 2012, a few weeks before the ALJ hearing, and more than two months after Williams had treated with either her psychologist or psychiatrist, Dr. O'Donnell wrote a letter summarizing her treatment of Williams from September, 2010 to May, 2012. In the narrative, Dr. O'Donnell reported the same symptoms, clinical findings and limitations that she had listed in her letter and questionnaire ten months earlier. She opined that the symptoms and limitations noted in July, 2011 "are current and have been present since Ms. Williams came under my care." R. at 448-49.

The ALJ gave "little weight" to Dr. O'Donnell's opinions in her letter reports of July 28, 2011 and June 6, 2012 that Williams's symptoms of re-experiencing traumatic events, hyperarousal and numbing disabled her from working full time in a normal, competitive work setting and were likely to disable her for more than twelve months. The ALJ provided two grounds for according little weight to these opinions. First, the narratives did not provide any specific work-related limitations. As the ALJ noted, they described Williams's symptoms without explaining how those symptoms prevented her from engaging in any aspects of her work. R. at 29.

Second, the ALJ found that Dr. O'Donnell's opinions were inconsistent with her treatment notes and the GAF score of 55.[6] The ALJ noted that the progress notes up to the time of Williams's hospitalization reflected that she was stable with therapy and had not taken psychotropic medication for several months. Although she felt some stress from the recent assassination of Bin Laden, she was feeling less stress due to her recent retirement

---

[6] The ALJ noted that when Dr. O'Donnell wrote the first narrative, she had only seen Williams twice. The first time was eight months earlier. The second time was one month after she had been hospitalized. R. at 28.

from work, and was planning to attend a military reunion of her shipmates in July.  R. at 29.

The ALJ observed that the progress notes following her hospitalization showed even more stability and improvement with compliance and adherence to treatment.  Upon discharge, Williams resumed taking antidepressant medication, increased contact with her mother and sister, still planned to go to her shipmates reunion, started exercising, and was overall feeling more positive.  The progress notes for the next nine months reflected that after taking psychotropic medications for several months, Williams was tapering off her medication.  Additionally, Williams requested to terminate therapy, stating that she had no therapy goals because she was "doing so well."  Finally, because a GAF score of 55 indicates only moderate symptoms, the ALJ found that Dr. O'Donnell's opinion that Williams was totally disabled from working was inconsistent with the GAF score that she had assessed.  R. at 28-29.

Considering the July 28, 2011 psychiatric/psychological impairment questionnaire, the ALJ gave little weight to Dr. O'Donnell's opinion that Williams was markedly limited in the areas that she stated.  The ALJ found that Dr. O'Donnell's opinions in the questionnaire, like those in her narrative letters, were inconsistent with her treatment notes and the GAF score of 55.  R. at 29.


*Opinions of Psychologist, Marta MacDougall, Psy.D.*

On the day Williams was discharged from the hospital, Dr. MacDougall wrote a letter in support of her application for Social Security benefits.  In the letter, Dr. MacDougall referenced Williams's dissociative episode the previous week leading to the psychiatric hospitalization.  She also noted that Williams "experiences frequent distressing intrusive

memories of her traumatic military experiences, severe insomnia, nightmares, flashbacks, panic attacks and depressed mood." She stated that she was "unable to cope adequately on the job . . . as she was frequently overcome by anger, tears, or anxiety. . . [and] would also frequently call out from work or be sent home early because of her symptoms[.]" She opined that Williams "should be granted SSDI, as her severe PTSD and Depression symptoms prevent her from obtaining and/or maintaining gainful employment." R. at 375.

The ALJ provided several reasons for giving "little weight" to Dr. MacDougall's opinion that Williams's severe PTSD and depression symptoms prevent her from obtaining or maintaining gainful employment. She noted that the psychologist's letter was written the same day that Williams was discharged from her psychiatric hospitalization. Her assessment was as of the moment Williams had reached her lowest level of functioning during all of her treatment. Additionally, for the same reasons she assigned little weight to Dr. O'Donnell's opinions, the ALJ reiterated how the progress notes reflected that Williams had been stable with therapy and had not taken psychotropic medication for several months prior to her hospitalization, and following her hospitalization she was more stable and improved with compliance and adherence to treatment. For those reasons, the ALJ determined that Dr. MacDougall's opinion was "inconsistent with the claimant's therapy record." R. at 29.

Williams asserts several grounds why the ALJ erred in according "little weight" to the opinions of Drs. O'Donnell and MacDougall. First, she argues that there is "no evidence" to support the ALJ's finding that her improvement in April, 2012 was "sustained or significant enough to permit her to work on a regular basis," and that "the treatment notes document only modest improvement at best . . . followed by periods of worsening

22

symptoms." Pl.'s Br. at 6, 11.  Williams cites bits of the notes out of context.  For example, she refers to having told Dr. MacDougall on March 12, 2012 that she was feeling "very bad" and "down" that day, and still not sleeping well.  Also, on March 26, 2012, a mental status exam by Dr. O'Donnell revealed "no meaningful improvement."  Pl.'s Br. at 5, 10.

There is substantial evidence supporting the ALJ's finding that Williams's mental health improved steadily over the nine-month period following her hospitalization, and that by April, 2012, she was stable.  Although Williams still had some psychiatric symptoms in the latter months of that time period, such as insomnia and occasional mood swings, many others were no longer present or had decreased in severity and frequency.  She no longer complained of nightmares, intrusive recollections or panic attacks.  She was not taking any psychotropic medication.  She was no longer wearing sunglasses during appointments.  She had increased contact with her family and friends, which greatly reduced her social isolation and gave her support.  She volunteered at a youth recreation center and helped her mother.  Her mood was generally improved.  She was pleased with her weight loss and exercise program.  She had stopped psychotherapy because she was "doing so well."

On the visit of March 12, 2012, when she stated that she was feeling "very bad" and "down," Williams explained that back and knee pain were the primary sources of her frustration and depression.  She reported that most of the day she was not depressed.  She denied any need for help or therapy to deal with her frustration and sadness from the physical pain.  Though she was still having trouble sleeping, she expressed interest in pursuing cognitive behavioral therapy strategies to address this issue.  Williams reported that "everything else" was "good," and that she was spending time with family and friends, engaging in enjoyable activities, listening to music and comedy tapes, and reading poetry.

Regarding the March 26, 2012 progress note that Williams had "no meaningful improvement," Williams neglects the context in which it was made.  The reference was to her history of taking Celexa.  It reflects the effectiveness of Celexa from July, 2001 *up until November, 2011*.  *See* R. at 456-67.  The statement did not describe Williams's status as of March, 2012.  Nor did it relate to her overall mental health.

Second, Williams contends that the ALJ did not develop the record adequately to "make a fair determination of the length and extent of her alleged improvement."  Although she concedes that in April of 2012 she requested to discontinue psychotropic medications and therapy, she contends that the ALJ should have requested updated records to confirm her testimony at the hearing in June that she was back on medication and attending therapy regularly.[7]  She claims that this would have shown that her "improvement was short-lived and not representative of her functioning over a longitudinal period."  Pl.'s Br. at 6, 11.

Although there were subsequent treatment records that the ALJ did not have,[8] these later records actually provide additional support for the ALJ's finding that by April, 2012 Williams's mental health was significantly improved and stable.  In her phone therapy session with Dr. O'Donnell on July 2, 2012, Williams reported that she was not currently taking any medication, was feeling "ok," and was spending time with family.  She told the

---

[7] At the hearing, Williams testified that she was taking one psychotropic medication to address her insomnia.  She also testified that she had begun seeing a therapist at the local Vet Center in May, and would be seeing her every four to six weeks.  R. at 48-49.

[8] In November of 2012, more than three months after the ALJ issued her decision, Williams's counsel submitted to the Appeals Council additional medical records.  The later-submitted records document one phone therapy session with Dr. O'Donnell on July 2, 2012; one visit to Dr. MacDougall on September 13, 2012; and four therapy sessions at the local Vet Center from May 30 through October 15, 2012.

psychiatrist that she had connected with a therapist at the local Vet Center and felt "safe and supported there." R. at 513. At Williams's request, Dr. O'Donnell terminated care.

Williams saw Dr. MacDougall on September 13, 2012. She had called a month earlier to schedule an appointment because she was having a lot of physical pain, which made her feel "a little depressed." By the time of the appointment, her pain had subsided. She was feeling "fine" and in a "good" mood. She was back to doing her regular activities. She was attending therapy sessions at the Vet Center. Williams reported that she didn't "want to work on anything," but wanted to "check in with someone at the VA every now and then." Dr. MacDougall referred her to the psychiatrist for periodic check-ins. Williams stated that her plan was to terminate therapy with Dr. MacDougall, schedule a check-in session with Dr. O'Donnell, and continue in informal supportive therapy at the Vet Center.

The records of Williams's therapy sessions at the Vet Center from May 30 through October 15, 2012, reflect that Williams discussed difficulties sleeping, bad memories of her experiences while on active duty, her avoidance of dark places and experiencing nightmares.

The updated records contradict rather than confirm Williams's testimony in June that she was back on medication. They also undercut her contention that her "improvement was short-lived." The last progress notes the ALJ had from late March and early April, 2012 reflect that Williams told her psychiatrist and psychologist that she had completely tapered off her psychotropic medications and reported that she was doing "very well." R. at 453, 457. The progress notes from the two treatment sessions after the hearing reflect that Williams still was not taking any psychotropic medication, and that she had terminated treatment with her psychiatrist.

In July, Williams told the psychiatrist that she felt "safe and supported" by the therapist at the local Vet Center.  More than two months later, in September, she told her psychologist that she was feeling "fine" and in a "good" mood.  Her plan was to continue informal supportive therapy at the Vet Center, terminate long-term therapy at the VA and schedule a check-in session at VA.  The supplemental records from the Vet Center reflect that she was, indeed, receiving supportive therapy there.  Thus, the updated records support the ALJ's finding that the improvement in Williams's mental status was significant and sustained.

Third, Williams contests the ALJ's reliance on the GAF score, arguing that "a GAF score as high as 55 does not automatically equate with a finding that she is not psychiatrically disabled."  She argues that this is consistent with the most recent edition of the *Diagnostic and Statistical Manual of Mental Disorders*, the *DSM-5*, which stopped using GAF scores as a diagnostic tool for assessing a patient's functioning because the GAF scale had "a conceptual lack of clarity" and "questionable psychometrics in routine practice."  Pl.'s Br. at 11 (quoting *DSM-5* at 16).  Williams also cites the Social Security Administration's response to a comment to a proposed regulation, which states that a claimant's GAF score is not considered to have a "direct correlation to the severity requirements."  Pl.'s Br. at 11 (quoting 65 Fed. Reg. 50746, 50764-65 (2000)).

The ALJ stated that when she considered the GAF scores, she gave them limited weight because they "represent a clinician's judgment about the severity of an individual's symptoms or level of mental functioning at a particular moment in time." She then noted that the majority of the scores indicated moderate symptoms or difficulties.  R. at 28-29. Similarly, in considering Dr. O'Donnell's opinion, the ALJ did not assign great weight to the

GAF score that Dr. O'Donnell gave Williams.  Rather, she compared the GAF score with the opinions Dr. O'Donnell rendered as to the severity of Williams's limitations and ability to work to determine if her opinions were consistent with that score.  Therefore, the ALJ did not err in considering the GAF score that Dr. O'Donnell assessed on the same day that she rendered her opinions about Williams.

Fourth, citing 20 C.F.R. § 404.1527(c)(2), which states that the Commissioner must give controlling weight to a treating physician's opinion that is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record," Williams argues that the opinions of Drs. O'Donnell and MacDougall are well-supported and uncontradicted by other substantial evidence because they provide detailed clinical findings on Williams's symptoms and diagnoses.

With respect to Dr. O'Donnell, Williams asserts that her opinions are based on psychiatric clinical and diagnostic findings[9] of appetite disturbance with weight change, sleep disturbance, mood disturbance, recurrent panic attacks, difficulties thinking or concentrating, time or place disorientation, social withdrawal or isolation, intrusive recollections of a traumatic experience, and generalized persistent anxiety.  Williams notes that "the ALJ [did] not find Dr. O'Donnell's opinions were not supported by appropriate clinical and diagnostic evidence."  Pl.'s Br. at 11.

This argument is without merit.  Although the ALJ did not dispute Dr. O'Donnell's

---

[9] This is not entirely accurate.  Dr. O'Donnell provided clinical findings in the questionnaire in order to explain the basis for Williams's diagnoses of PTSD and MDD.  *See* R. at 381 ("5. Identify the positive clinical findings that demonstrate and/or support your diagnosis.").

*clinical findings* in the narrative letters and questionnaire, she found that the doctor's *opinions* regarding Williams's disability and limitations were inconsistent with treatment notes and other substantial evidence in the record.  For the reasons explained above, this finding is supported by substantial evidence.

Additionally, the ALJ's finding that the psychiatrist's opinion of disability was not supported by substantial evidence is bolstered by comparing Dr. O'Donnell's two letters with other evidence.  The clinical findings in Dr. O'Donnell's second narrative letter written on June 6, 2012 are *identical* to those in her letter written ten months earlier.  Yet, it is undisputed that some of Williams's symptoms and level of functioning had improved in that ten-month period.

With respect to Dr. MacDougall, Williams contends that her opinion was not simply offering a "bald legal conclusion" that Williams was "disabled" because it includes a detailed narrative report on Williams's diagnoses, symptoms and limitations. Consequently, she argues, the ALJ erred by rejecting Dr. MacDougall's opinion as an issue "reserved to the Commissioner."  Pl.'s Br. at 6.  Williams argues that Dr. MacDougall's opinion is entitled to controlling weight because it is a "medical opinion" as defined in 20 C.F.R. § 404.1527(a)(2), which is "entitled to significant weight."  Pl.'s Br. at 6-7.

A treating physician's opinion that a claimant is totally disabled does not dictate the ALJ's determination of a claimant's functional capacity.  *Brown v. Astrue*, 649 F.3d 193, 196 & n.2 (3d Cir. 2011) (quoting *Adorno v. Shalala*, 40 F.3d 43, 47-48 (3d Cir. 1994) ("[A] statement by a plaintiff's treating physician supporting an assertion that she is 'disabled' or 'unable to work' is not dispositive of the issue")).  A statement by a "medical source" that a claimant is "disabled" or "unable to work" is an opinion "on issues reserved to the

Commissioner." 20 C.F.R. § 404.1527(d)(1). Consequently, the ALJ "will not give any special significance to the source of an opinion on [such] issues." *Id.* § 404.1527(d)(3).

Contrary to Williams's argument, medical opinions are not entitled to "significant weight." 20 C.F.R. § 404.1527(c) provides that the opinion of a treating physician is to be given controlling weight only when it is well-supported by medical evidence and is consistent with other evidence in the record. *Id.* § 404.1527(c)(2). If the opinion is not supported by the medical evidence and is inconsistent with the record, the ALJ is not required to accord it controlling weight. *Johnson*, 529 F.3d at 202 (citation omitted). In fact, in that case, the ALJ may reject it. *Brown*, 649 F.3d at 196 & n.2. As explained above, the ALJ's determination that Dr. MacDougall's opinion was "inconsistent with the claimant's therapy record" is supported by substantial evidence.

Finally, Williams contends that the ALJ erred when she did not consider the factors in 20 C.F.R. § 404.1527(c)(2)-(6) when deciding the weight to assign to the opinions of Drs. O'Donnell and MacDougall. Under this regulation, when the ALJ has determined that she will not give controlling weight to a treating source's opinion, she is required to apply the following factors to determine the weight to give the opinion: length, nature, extent and frequency of the treatment relationship; amount of relevant evidence supporting the opinion; consistency of the opinion with the whole record; and specialization of the provider. *Id.* § 404.1527(c)(2)-(6).

Williams argues that applying these factors to this case warrants according more weight to the doctors' opinions than the ALJ assigned them. Both doctors, specialists in their respective fields of psychiatry and psychology, treated Williams over a long period of time. Their treatment focused on Williams's mental impairments. They cited to medical

findings that supported their opinions, which are documented by mental status examinations in the records.  Williams argues that the ALJ did not consider these factors before deciding to assign little weight to the doctors' opinions.  Pl.'s Br. at 7, 12.

The ALJ properly considered the factors in § 404.1527(c)(2)-(6).  With respect to Dr. O'Donnell, she noted that when the doctor wrote her first narrative, she had seen Williams only twice.  The first time was eight months earlier; and, the second time, one month after she had been hospitalized.  R. at 28.  When she wrote her second narrative about a year later, she had seen Williams four more times, the visits at least two months apart.  Thus, although Dr. O'Donnell saw Williams over sixteen months, she saw her infrequently in that time period.  *See* 20 C.F.R. § 404.1527(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.").  Additionally, the ALJ noted that Dr. O'Donnell's narratives described Williams's symptoms without explaining how those symptoms prevented her from engaging in any aspects of her work. She also found that Dr. O'Donnell's opinions were inconsistent with her treatment notes and the GAF score of 55.  R. at 29.  *See* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.  The better an explanation a source provides for an opinion, the more weight we will give that opinion.").  Thus, the ALJ made this determination after taking the factors in § 404.1527(c) into consideration.

With respect to considering Dr. MacDougall's opinion, the ALJ did not question Dr. MacDougall's qualifications, or her clinical ability to diagnose or identify symptoms.  Rather, she considered the factors set forth in § 404.1527(c)(3) and (4), which address the amount

of relevant evidence supporting the opinion and the consistency of the opinion with the whole record.  She determined that Dr. MacDougall's assessment of Williams immediately following her hospitalization failed to take into account the stability and improvement that Williams had attained in the subsequent nine months.  It was because Dr. MacDougall's opinion was inconsistent with the entire treatment record that the ALJ assigned little weight to it.

*Opinion of Non-Examining State Psychologist, Thomas Fink, Ph.D.*

The ALJ gave significant weight to the opinion of Thomas Fink, Ph.D., the non-examining state psychologist.  She relied on his opinion, together with the additional medical evidence submitted, to determine Williams's RFC.  R. at 28.  Williams argues that the ALJ should have applied the rule in 20 C.F.R. § 404.1527(c)(1), that non-examining sources are entitled to the least amount of weight, especially when there is well-supported contradictory evidence in the record from treating medical sources.  Pl.'s Br. at 12-13.

Dr. Fink completed his report on May 27, 2011 after reviewing Williams's mental health records from September 2010 through March 31, 2011.  He opined that Williams was moderately limited in her ability to maintain attention and concentration for extended periods;  complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting.  He found that she had good skills in activities of daily living and good cognitive abilities.  He noted that although she was withdrawn and

socially avoidant, she had friends and was able to communicate well and interact with others. He observed that despite her limitations, Williams could make scheduled appointments, travel within the community, carry out very short and simple instructions, maintain socially appropriate behavior, and make simple decisions. He concluded that she could meet the basic mental demands of simple work on a sustained basis. He also stated that his analysis "is consistent with a VA opinion [of Jason Goodson, Ph.D.] . . . analy[sing] the impact of [her] PTSD on her functioning, dated 9/15/10. It also appears consistent with later follow-up contacts made at the VA." R. at 80-82.

The ALJ gave Dr. Fink's opinion "significant weight" because she found that it was consistent with the medical evidence as a whole. Specifically, she found his opinion consistent with Williams's mental status examinations, which documented that she had intact cognition, and a logical and linear thought process. She also concluded it was consistent with her improvement and termination of psychological services in April, 2012. R. at 28.

Williams notes that all but one mental health record Dr. Fink reviewed pre-dated Williams's amended disability onset date of March 29, 2011, and that he relied primarily on a report dated September 15, 2010, which is prior to the onset date. She argues that it was error for the ALJ "to give greater weight to the opinions from a non-treating, non-examining medical source who reviewed a marginally developed record and relied primarily on evidence not relevant to the period at issue over findings from treating specialists that are consistent with the record." Pl.'s Br. at 13.

Although Dr. Fink wrote his opinion without the benefit of the full record, the ALJ correctly noted that it was consistent with the record that the ALJ had. R. at 28.

Furthermore, Dr. Fink did not state that he based his opinion solely on the opinion of Dr. Goodson.  Rather, he stated that his analysis was "consistent with" that opinion *and* "consistent with later follow-up contacts" at VA.  R. at 82.  Finally, unlike Drs. O'Donnell and MacDougall, Dr. Fink did not merely list Williams's symptoms and limitations.  He analyzed the treatment record to determine whether Williams had any specific work-related limitations.  For example, he observed that although she was withdrawn, she had some friends and communicated and interacted with others.  Additionally, she could make scheduled appointments, travel within the community, carry out very short and simple instructions, maintain socially appropriate behavior, and make simple decisions.  Based on those observations and assessments, he then concluded that Williams could meet the basic mental demands of simple work on a sustained basis.[10]

In sum, the ALJ did not put undue weight on the non-examining psychologist's opinion nor did she err in according little weight to the opinions of Drs. O'Donnell and MacDougall.  Unlike the opinions of the treating psychologist and the psychiatrist, Dr. Fink's findings and opinion were consistent with the whole record, including Williams's mental status examinations, her eventual tapering off of all psychotropic medications, and her sustained improvement in overall functioning and mood.  The fact that Dr. Fink issued his report before Williams's onset date is not relevant because the ALJ found that his opinion was consistent with what the record showed regarding Williams's mental health status after he issued his report.

Because the ALJ explained why she assigned less weight to the treating physicians'

---

[10] In fact, Dr. Goodson, whose report Dr. Fink cited, performed a similarly specific work-related limitation analysis, where he analyzed how her symptoms specifically affected her functioning level at work, socially, cognitively and in activities of daily living.  R. at 304-07.

opinions and more weight to the State agency's position, as she could under 20 C.F.R. § 404.1527(c), she did not err.  *See Brown*, 649 F.3d at 196-97.

<u>The ALJ's Findings Regarding Williams's Credibility</u>

Williams argues that the ALJ failed to properly evaluate Williams's credibility.  She contends that the ALJ's finding that Williams's "statements concerning the intensity, persistence, and limiting effects of [her] symptoms [were] not credible to the extent they are inconsistent with [her] residual functional capacity assessment," was not supported by substantial evidence.  She also contends that the ALJ applied the wrong legal standard when evaluating Williams's credibility.  Pl.'s Br. at 15.

The ALJ must give a claimant's subjective complaints "serious consideration." *Burns v. Barnhart*, 312 F.3d 113, 129 (3d Cir. 2002) (citing *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993)); *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 363 (3d Cir. 2011) ("[A]ny statements of the individual concerning his or her symptoms must be carefully considered") (quoting SSR 96-7p, 1996 WL 374186 (July 2, 1996)).  At the same time, a claimant's allegations of pain and other subjective symptoms must be supported by objective medical evidence.  *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999) (citing 20 C.F.R. § 404.1529).  Once the ALJ concludes that a medical impairment that could reasonably cause the alleged symptoms exists, she must evaluate the intensity, persistence and limiting effects of the pain or symptom to determine the extent to which a claimant is accurately stating the degree to which she is disabled by it.   *Id.* (citing 20 C.F.R. § 404.1529(c)(4) ("[W]e will evaluate your statements in relation to the objective medical evidence, . . . . [and] consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the

rest of the evidence, including your history, the signs and laboratory findings, and statements by your treating or nontreating source or other persons about how your symptoms affect you.")).  If a claimant's testimony about her limitations or symptoms is inconsistent, the ALJ may conclude that some or all of the testimony is less than fully credible.  *Chandler*, 667 F.3d at 363 (citing § 404.1529(a)); *Burns*, 312 F.3d at 129-30.

Williams testified at the hearing about her symptoms and activities.  According to her, she continued to have daily nightmares, disturbed sleep and flashbacks.  On some days she did not want to get out of bed.  She only left her home two to three times a week to drive to her mother's house or the grocery store.  Although she lived by herself, her niece stayed with her periodically to help her do things around the house.  Williams also testified that she was taking medication for her psychiatric problems, the name of which she did not know, and that she had begun attending therapy once a month.  R. at 42, 44, 48-50, 63-64.

Williams argues that the ALJ applied the wrong legal standard because she compared her testimony about her symptoms and limitations to her assessed RFC instead of the evidence.  She contends, in essence, that the ALJ determined Williams's limitations first, and then used these limitations to determine her credibility about her subjective symptoms.  She also argues the ALJ gave a "cursory evaluation" of Williams's testimony by "reject[ing her testimony] based on an incomplete record" and failing to compare Williams's statements regarding her "symptoms, limitations, limited activities, and lack of significant response to treatment against the record."  Pl.'s Br. at 14-16.

Both arguments fail.  First, in weighing Williams's credibility, the ALJ did not compare Williams's testimony about her symptoms and limitations to her assessed RFC.

Although earlier in the decision the ALJ stated that Williams's statements about the intensity, persistence and limiting effects of her symptoms were inconsistent with her RFC, she later found that a "review of the medical evidence of record indicates that the functional limitations caused by [Williams's] alleged post-traumatic stress disorder and depression are less severe than alleged by [Williams]."  R. at 26, 28.  This statement was followed by a thorough analysis of Williams's eighteen-month mental health treatment history that included consideration of all of the medical evidence in the record, and the opinions of the two treating physicians and the state-agency psychologist.  This review led the ALJ to conclude that by April, 2012, Williams showed "significant improvement with compliance and adherence to treatment."  R. at 28-30.

The ALJ did not base her conclusions on an "incomplete record."  She did more than a "cursory" review of Williams's testimony.  That the ALJ did not have the records of Williams's last treatment visits with Drs. O'Donnell and MacDougall does not render the ALJ's findings erroneous.   Indeed, these later-produced records directly contradict Williams's testimony that at the time of the hearing she was back on medication.  They confirm the ALJ's finding that by April, 2012, Williams's mental health was improved and stable.  Additionally, the ALJ adequately compared Williams's testimony regarding her symptoms and limitations to the record as a whole.  As reflected by the record, although Williams still had some psychiatric symptoms in the months leading up to the hearing, such as  insomnia and occasional mood swings, many were no longer present or were reduced in severity and frequency.  She no longer complained of nightmares, intrusive recollections or panic attacks.  She was not taking any psychotropic medication.  She was no longer wearing sunglasses during appointments.  She had increased contact with her family and

friends, which greatly reduced her social isolation and gave her support.  She volunteered

at a youth recreation center and helped her mother.  Her mood was generally improved.

She was pleased with her weight loss and exercise program. Significantly, she had

terminated psychotherapy because there was nothing she wanted to work on since she

was "doing so well," and was scheduled only for periodic check-ins with the psychiatrist.

Therefore, the ALJ did not fail to consider Williams's testimony against the record and in

finding her testimony about the severity of her symptoms and limitations partially credible.

<u>The ALJ's Reliance on the Vocational Expert's Testimony</u>

Williams asserts that the ALJ erred in formulating hypothetical questions posed to

the VE.  First, she claims that the hypothetical question was based upon a flawed RFC

finding.  Second, she contends that the hypothetical did not include all of the mental

limitations that the ALJ had found.   As a result of these errors, she argues, the

Commissioner has not met her burden to demonstrate that there is alternative work that

Williams can perform.  Pl.'s Br. at 17-18.

At the hearing, the ALJ posed the following hypothetical question to the VE:

> Assuming the same age, education and work experience as
> Williams, and the ability to perform work at the light exertional
> level, but limited to unskilled work with routine, repetitive tasks,
> performed in a low-stress environment (defined as no frequent
> independent decision making and no frequent changes in the
> work setting) with no public interaction, and only occasional
> interaction with coworkers and supervisors, would there be any
> unskilled occupations for such a hypothetical individual?

R. at 70-71.  The VE responded that there were jobs in the national economy for such an

individual.  All of the skills and limitations the ALJ described in this hypothetical match the

RFC the ALJ assessed Williams.  R. at 25.

37

The ALJ asked another hypothetical question which was identical to the first question, with the additional limitations of the individual's ability to only occasionally, throughout the workday, maintain concentration and attention, work around others, and respond appropriately to criticism.  In response to this question, the VE responded that there would not be any jobs for an individual with these limitations.  R. at 72-73.

When counsel asked the VE whether there were jobs in the economy for an individual who missed work more than three times a month, the VE stated that there were not.  R. at 73.

With respect to the argument that the ALJ accepted a hypothetical based on a flawed RFC finding, Williams contends that the ALJ should have accepted the second and third hypothetical questions, which included the limitations of the ability to only occasionally maintain concentration and attention, work around others, and respond appropriately to criticism, and to miss work more than three times a month.  She argues that these limitations are consistent with the well-supported opinions from the treating specialists, Drs. MacDougall and O'Donnell.  Pl.'s Br. at 17 (citing opinions of Drs. O'Donnell and MacDougall).

This argument rests upon the opinions of Drs. MacDougall and O'Donnell, which the ALJ rejected or gave little weight.  Because we have concluded that the ALJ's treatment of those opinions was supported by substantial evidence, it was not error to rely on the VE's testimony regarding the first hypothetical, which did not incorporate them.

Williams also contends that the ALJ erred because she found that Williams has moderate difficulties in social functioning and in concentration, persistence, or pace, but failed to include these limitations in the hypothetical to the VE.  She states that a restriction

to doing only routine, repetitive tasks, and limiting her to a low-stress environment, do not take into account her difficulties in maintaining persistence or a particular pace.  She argues that this was error because the VE testified that Williams could work as an assembly machine tender, inspector, and conveyor line bakery worker, all of which require work at a particular production pace.  Pl.'s Br. at 17-18.

The Commissioner contends that Williams's argument is based upon a flawed premise because she is confusing the ALJ's determination of the severity of her mental impairment at steps two and three of the sequential evaluation with the determination of RFC at step four.

The ALJ explained the process she applied at the third step of the sequential evaluation in making the finding that the severity of Williams's mental impairments did not meet or medically equal the criteria of listings 12.04 and 12.06 for affective and anxiety disorders:

> In making this finding, I have considered whether the "paragraph B" criteria were satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence , or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme.  Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.

R. at 24.

The ALJ then rated the severity of limitation or restriction that Williams had in four areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence and

pace; and (4) episodes of decompensation.[11]   When she calculated the ratings, she determined that they did not meet the "paragraph B" criteria of the mental impairment listings.  R. at 24-25.  She concluded her analysis by explaining that "the limitations identified in the 'paragraph B' criteria are not the residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process."  R. at 25.

The ALJ then explained how she determined Williams's RFC at the next step of the evaluation.  She noted that

> [t]he mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing impairments (SSR 96-8p). . . . [T]he following residual functional capacity assessment reflects the degree of limitation I have found in the "paragraph B" mental function analysis.

R. at 25.  The ALJ then determined Williams's RFC.  R. at 25-30.

Because the determinations of impairment severity and listings analysis are distinct from the determination of RFC, the ALJ was not required to include any of the step three conclusions in the RFC.  Therefore, the ALJ did not err when she relied on the VE's testimony regarding the first hypothetical.

---

[11] This was where the ALJ found that Williams had moderate difficulties in social functioning and in concentration, persistence, or pace.  R. at 24.

**Conclusion**

Because the ALJ's decision is supported by substantial evidence, the decision of the Commissioner is affirmed.